Republic Cotton Mills v. Commissioner.
Republic Cotton Mills v. Commissioner
Docket No. 302 P.T.
United States Tax Court
1943 Tax Ct. Memo LEXIS 123; 2 T.C.M. (CCH) 753; T.C.M. (RIA) 43517; September 8, 1943
*123 Respondent's action in disallowing claim for refund of processing taxes paid on the first domestic processing of cotton approved. John W. Townsend, Esq., and J. Craig Peacock, Esq., for the petitioner. Raymond F. Brown, Esq., and Oliver L. Bright, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion This proceeding involves a claim for refund of taxes paid by the petitioner on the first domestic processing of cotton in the amount of $435,340.73. The claim was disallowed in its entirety by the respondent and the petitioner brought this proceeding by filing a petition with the United States Processing Tax Board of Review. By Section 510 of the Revenue Act of 1942 the Board of Review established under Section 906(b) of the Revenue Act of 1936 was abolished and the jurisdiction theretofore vested in it was transferred to and vested in the Tax Court of the United States. The instant proceeding was pending before the Board of Review on December 31, 1942, the effective date of the above provision of the Revenue Act of 1942. Prior to that date full hearing had been held, briefs had been filed, and the presiding Member of the Board of Review had filed his recommended *124 findings of fact. Petitioner had filed certain exceptions to the recommended findings but respondent filed no such exceptions. Thereafter oral argument was had before the full Board of Review. At this stage the proceeding was transferred to this Court for further consideration and decision. The question for decision is whether the petitioner bore the burden of any part of the processing taxes paid by it under the Agricultural Adjustment Act and, if so, the amount of such taxes. Findings of Fact 1. Petitioner is a South Carolina Corporation, organized in 1909. Between August 1, 1933, and March 31, 1935, the period during which petitioner paid the tax here involved, and for many years before and after such dates, petitioner was engaged in the manufacture of cloth from cotton, rayon and silk. 2. During the period the tax was in effect, petitioner reported the tax due on one monthly return for its three mills and paid as tax $435,340.73 and $53.61 as interest. On June 29, 1937, petitioner filed with respondent claim for refund of processing tax in the amount of $435,343.54. The claim for refund was disallowed in full by respondent by registered letter dated July 3, 1940. Petition *125 for review of such disallowance was filed on August 6, 1940. 3. Petitioner operated three mills in Great Falls, South Carolina, which is an unincorporated community of approximately 4,000 inhabitants and which is located some distance from any other town. Substantially all of the residents of Great Falls are connected in some capacity with petitioner's mills, and with the exception of two or three hundred persons living in an outlying section, virtually all of the residents live in homes which are owned by petitioner. In the operation of its business, petitioner furnishes such utilities as are necessary to maintain essential community services. 4. The city nearest Great Falls from which petitioner might draw labor for service in its mills was, during the period here in question, located 25 miles distant by road. To hold a supply of labor necessary to the operation of its mills, petitioner was required not only to supply essential community services but to maintain the payment of wages sufficient in amount to enable its employees to live, regardless of the conditions of the market for petitioner's products. This was particularly true with respect to Mill 3 which was devoted solely *126 to the manufacture of the special goods requiring an unusual degree of skill. As a result, petitioner was forced, on many occasions, to maintain the operation of its plants even though such operations were carried on at a loss. With the exception of the period of a strike in 1934 and for approximately 10 weeks during 1932, petitioner has never entirely closed any of its mills since the present management took over in 1927. 5. During both the period before and after the tax, hereinafter referred to as the "base period" (August 1, 1931-July 31, 1933, and February-July, 1936) and the tax period (August 1, 1933-March 31, 1935), and at other times, petitioner owned and operated three separate mills in the village of Great Falls: Mill 1, constructed in 1911; Mill 2, constructed in 1917; and Mill 3, constructed in 1924. Mill 1 is about a quarter of a mile distant from Mill 2, and Mill 3 is three-quarters of a mile distant from each of the other two mills. 6. During the statutory periods, and at other times, the yarn used in Mills 1-2 was spun therein. Those mills were operated together as a single manufacturing unit with the same superintendent and operating organization. They consumed *127 only carded cotton yarn and their production was limited to a few standard constructions of coarse cotton gray goods and certain special orders for closely related cloths, all in the print cloth division of the textile industry. During the entire tax period they made only five standard "constructions" (the term "construction" means the number of threads each way in a square inch, the width of the cloth, and the weight stated in the number of yards to a pound), consisting of three print cloths which represented in volume almost 75 per cent of the yardage sold, and two carded broadcloths; and in addition, one small order of a special but quite similar construction. 7. During the periods in question Mill 3 was operated separately from Mills 1-2. It had its own superintendent and operating organization; it maintained separate accounts, with the exception of accounts receivable and payable, mill village, power lines, etc.; and on occasions it maintained different hours of employment. It manufactured find goods and specialties in a division of the industry separate and apart from the manufacture of coarse goods produced in Mills 1-2. It manufactured, at various times during each period, *128 an all-cotton cloth, a cloth of mixed cotton and rayon, a cloth of mixed cotton and silk, an all-rayon cloth and, to an insignificant extent, a cloth containing a mixture of silk and rayon. During the base period it manufactured between 30 and 40 different constructions, but such constructions were made in a large number of different styles. During the tax period it made more than 50 different constructions in 500 or more styles, [1] very few of which were the same as styles produced in the other period. Prior to 1933 all of the products of this mill contained some cotton. Early in 1933 petitioner, for the first time, undertook to manufacture all-rayon cloths and in 1935 or 1936 began, for the first time, production of all-silk fabrics. With the exception of one standard combed cotton cloth and one standard combed lawn, practically all the production of Mill 3 was specially styled. All of its rayon and silk yarns it purchased, together with a small amount of cotton yarn, but most of its cotton yarn was spun in its own spinning plant. The mill used practically no carded cotton yarn but only fine combed yarn. *129 8. Petitioner, during both of the periods in question, pursued methods for the sale of its product which were common to the cotton industry generally. Its cotton cloth was sold almost exclusively as gray goods through commission houses to large industrial users or converters and finishers who in turn dealt with the cutting-up trade, the large department and chain stores, and other large consumers. 9. During the tax period, petitioner sold the products of Mills 1-2 through Cannon Mills, Inc., of New York City, and the products of Mill 3 through J. P. Stevens & Co., of New York City. The relationship of petitioner with its selling agents was governed by the long-established custom of the trade i.e., the selling agents carried on all negotiations with the prospective purchaser, the ultimate price arrived at being subject to confirmation by petitioner. The commission house then became responsible to the purchaser for delivery of the goods and was responsible to petitioner for the contract price. Consummated sales negotiations were represented by brokers' sales notes in respect of transactions between the commission agent and the purchaser and by a sales contract between the commission *130 agent and petitioner. 10. The years 1930, 1931, and 1932 constituted one of the most unprofitable periods in the recent history of the entire textile industry. Operations throughout the industry during these years were seriously curtailed. In the spring of 1933, business confidence was on the way to being restored. Stocks of textiles in the hands of buyers and large users had, prior to this time, reached a low ebb and in the spring of 1933, in anticipation of rising price levels, demands for products on the part of buyers were greatly increased. 11. On July 9, 1933, the President of the United States approved under the National Industrial Recovery Act the first Code of Fair Competition which was the Code relating to the regulation of the Cotton Textile Industry. One of the provisions of this Code limited the maximum hours of labor to 40 hours a week. Since this constituted a sharp reduction of hours of labor then prevailing, petitioner and the industry generally instituted a double shift of 80 hours per week. This increase of hours over the prevailing 55 hours per week which had theretofore been in effect, plus the then existing increased demand for cotton textiles, brought a sharp *131 increase in production and a serious condition of over-production in the textile industry. By August, 1933, supply began to exceed demand, and that condition persisted with little abatement throughout the entire tax period. 12. Because of this serious oversupply, the Administrator of the National Industrial Recovery Act, to prevent the demoralization of price structure, executed orders on three different occasions limiting all productive machinery in the cotton textile industry to 75 per cent of the hours otherwise permitted by the Code. 13. During the tax period petitioner realized hedging gains in the amounts of $8,107.14 for Mills 1-2 and $1,694.25 for Mill 3. 14. Although with respect to Mills 1-2 and Mill 3 petitioner maintained separate books of account, manufactured different products, employed different sales agencies, and maintained separate organizations, the business conducted by the petitioner was carried on and maintained as a single business venture. 15. The statutory margin for the base period in respect of all the mills operated by petitioner is as follows: Gross sales
value of all
articles pro-
Cost of
Pounds
Average
duced, having a
cotton
Total
of cotton
margin
cotton content
processed
margin
processed
per pound
Mills 1-2
$2,474,685.65
$1,053,633.19
$1,421,052.46
11,417,265
$.1244652
Mill 3
1,943,955.78
344,854.02
1,599,101.76
2,937,597
.5443571
Mills 1-2-3
$4,418,641.43
$1,398,487.21
$3,020,154.22
14,354,862
$.2103924
*132 16. The statutory margin for the tax period in respect of all the mills operated by petitioner, on the basis of margins computed for each month's operations is set out in detail in the tabulation appearing in Finding 16 of the recommended findings of fact submitted by the Member of the Board of Review who presided at the hearing and is incorporated herein by reference. With the exception of minor typographical corrections this finding was agreed to and accepted by the parties. 17. The respondent collected from petitioner a processing tax, as shown in the tables above referred to, with respect to the cotton in its in-processing inventory at August 1, 1933, of laps, silver, and rovings. Such cotton had been put in process prior to that date but respondent held such cotton to be subject to the processing tax and not to the floor stocks tax. Due to a general strike in all cotton mills, petitioner's mills were not operated in September, 1934, and no cotton was processed in that month. 18. The separate and combined margins, as stipulated by the parties, are as follows: TAX PERIOD
Mills Nos. 1 and 2
Mill No. 3
Total
Gross Sales Value of All Articles
$2,829,311.39
$1,391,887.24
$4,221,198.63
Less: Cost of Commodity
(1,039,152.63)
(302,030.23)
(1,341,182.86)
Processing Tax
( 346,583.37)
( 88,810.97)
( 435,394.34)
Total
$1,385,736.00
$ 390,941.20
$1,776,577.20
Total Margin
$1,443,575.39
$1,001,046.04
$2,444,621.43
Units Commodity Processed
8,249,683
2,114,547
10,364,230
Average Margin Per Unit
$0.1749856
$0.4734092
$0.2358710
PERIOD BEFORE AND AFTER THE TAX
Mills Nos. 1 and 2
Mill No. 3
Total
Gross Sales Value of All Articles
$2,474,685.65
$1,943,955.78
$4,418,641.43
Less: Cost of Commodity
1,053,633.19
344,854.02
1,398,487.21
Total Margin
$1,421,052.46
$1,599,101.76
$3,020,154.22
Units Commodity Processed
11,417,265
2,937,597
14,354,862
Average Margin Per Unit
$0.1244652
$0.5443571
$0.2103924
Prima Facie Showing as to Tax Burden
($0.0505204)
$0.0709479
($0.0254786)
*133 19. In respect of deliveries made on or after August 1, 1933, on contracts which had been made prior to that date and which carried a tax-to-be-added clause such as described in Paragraph 20 of these findings, petitioner added to its invoices, and collected as separate items, designated as processing tax, amounts aggregating $27,224.55. Of that amount, $11,221.15 was applicable to sale contracts completed by delivery of goods, the cotton content of which had been subjected to the floor stocks tax. The balance of the amount, namely, $16,033.40, was applicable to sale contracts completed by delivery of goods, the cotton content of which had been subjected to the processing tax. Of this amount, $9,280.97 is attributable to Mills 1-2 production and $6,722.43 to Mill 3 production. 20. For three or four months prior to the effective date of the tax on the processing of cotton, during which period the cotton trade anticipated the possibility of the ultimate levying of such a tax, it was customary for contracts of sale to carry what was known as a tax-to-be-added clause, an example of which is in the following language: In addition to the net price stated herein, buyer agrees to pay to *134 the seller, upon collection by the Government, the amount which, because of this transaction or any portion hereof, the seller is required to pay to the Federal Government on account of taxes or charges not now existing. If such taxes or charges be imposed upon raw material, a proper allowance for waste is to be added. All of petitioner's contracts for the sale of its articles containing a cotton content executed within several months prior to August 1, 1933 carried such a clause or a clause of similar import. The price on any contract carrying such clause necessarily remained indeterminate until delivery had been completed, (1) because the rate of the tax was not immediately known, (2) because deliveries might be completed before the imposition of the tax, and (3) because some uncertainty existed as to the appropriate conversion factor which would represent tax on a pound of raw cotton converted to tax on a yard of completed goods. These conversion factors necessarily varied between different mills and resulted in a certain amount of confusion. 21. After these uncertainties had, to a certain extent, been removed by the imposition of the tax and the determination of the rate, selling *135 agents representing the various mills undertook to revise the tax-to-be-added clause then generally in effect. The Association of Cotton Textile Merchants of New York joined in making a recommendation for the addition of clauses substantially in words as follows: That on any business, on and after August 1, prices be quoted and sales made to include the cotton processing tax of .0420 a pound as part of the cost of raw material. This manner of application consistently followed throughout the market, will simplify the handling of this problem. * * * the present tax and/or labor clauses * * * should be discontinued as of August 1, inasmuch as quotations will be based on existing conditions with respect to all manufacturing costs. Clauses of an import similar to that contained immediately above were generally and immediately adopted by petitioner, with respect to all of its mills, and by the entire industry. On contracts executed after August 1, 1933, the tax-to-be-added clause above quoted was discontinued by petitioner in favor of the clause last quoted except that in occasional instances a typewritten clause to the effect that "price includes processing tax" was added. 22. On August *136 1, 1933, for the express purpose of shifting the burden of the processing tax, offering quotations on each of the standard constructions made by Mills 1-2 were very generally increased by adding to the basic quotations at which its goods had been sold in July, amounts varying from 3/4 cent to 1 1/4 cents, according to the amount of tax estimated to have been incurred with respect to a finished yard of each particular construction. The volume of sales at these prices were relatively small, although petitioner and its selling agent endeavored to effect sales at the new level of prices and thus to pass on the burden of the processing tax. A table setting forth in cents per yard the trend of prices during July and August, 1933 on said sales made by petitioner during the month of July, 1933 is set out in the recommended findings of fact of the Member of the Board of Review presiding at the hearing, and is incorporated herein by reference. 23. Contracts with respect to sales of Mill 3 before and after the taking effect of the processing tax on August 1, 1933, carried clauses or words similar to those used during the same periods by Mills 1-2. 24. On and after August 1, 1933, phrases such *137 as "tax included," "prices include processing tax," "including processing tax," and the like were widely used by trade journals in connection with published market quotations. The use of such phrases in that connection grew out of the fact that published quotations and prices on and after that date were all stated at flat, all-inclusive figures which were not subject to further adjustment on account of the processing tax, and also because it was highly desirable that it be made clear that published quotations were on this new basis as distinguished from methods of quotation which had been used prior to August 1, 1933. 25. These phrases were not generally used in petitioner's sales contracts. During the 20 months' tax period, petitioner entered into 596 sales contracts for Mills 1-2 and 487 sales contracts for Mill 3, a total of 1,083 contracts. In but 27 of those contracts with respect to Mills 1-2 and 27 of such contracts with respect to Mill 3, did any such phrase appear. 26. Petitioner did not manufacture any "seconds" out of lower-cost materials. Imperfect yarn, machinery stoppages, and similar causes did, however, result in the production of a certain amount of imperfect cloth *138 which had to be sold as seconds and at lower prices than firsts. The actual cost of such seconds was ordinarily higher instead of lower than that of firsts. Special pick-out operators were employed in the weave room to repair and remove defects so as to make the goods salable as seconds. Additional handling and packing were required in the cloth room, and the goods were ordinarily sold in small bales rather than in large quantities. During the period from August 1, 1933 to July 31, 1935, seconds constituted approximately 2.7 per cent of the total of approximately 33,000,000 yards of cloth sold by Mills 1-2. 27. During the tax period and the immediately succeeding four months, i.e., from August 1, 1933 to July 31, 1935, inclusive, in no instance was there a sale of any construction by Mills 1-2 at a price as high as the August 1, 1933 quotations shown in the table incorporated by reference in Finding 22. However, during that period certain sales were made by petitioner at prices in excess of the prices received by it on sales made July 13-15, 1933, (or the July 31, 1933, quotation, if lower) as shown in said table. The total amount received in each month of the tax period on such *139 sales exceeds by the amount set forth in column 2 of the following table, the sum that would have been received if sales of similar constructions and equivalent yardage had been made at such July, 1933 scale of prices. In column 3 of this table is set forth the balance remaining out of the taxes paid each month for Mills 1-2, after deducting such excess as set forth in column 2: Inventory 8/1/33
$ 8,296.17
August, 1933
$ 3,030.38
16,882.49
September
2,898.16
15,322.79
October
784.71
17,168.49
November
724.49
17,999.82
December
942.05
12,683.97
January, 1934
7,140.71
12,209.14
February
6,004.00
11,070.28
March
1,564.06
17,992.44
April
2,211.61
15,200.25
May
21,498.58
June
549.47
12,659.53
July
$ 1,050.94
$ 14,244.83
August
7,912.05
8,004.23
September
30.45
October
501.04
19,439.38
November
274.58
19,002.20
December
1,432.95
15,112.87
January, 1935
943.39
18,427.93
February
487.87
16,652.41
March
369.15
17,863.51
Totals
$38,852.06
$307,731.31
28. Mills 1-2 were originally constructed and equipped for the manufacture of print cloths and carded broadcloths similar to those produced during the tax period, and at all times prior to *140 that period had been exclusively engaged in the production of those and related constructions. Complete records of production and profits are not available for 1918 and prior years, but are available for years subsequent to 1918. For the entire period of 14 calendar years immediately preceding the tax period (i.e., 1919-1932, inclusive) the average manufacturing profit from Mills 1-2 was equivalent to $.05558306 per lint pound processed. 29. In four out of the 20 months of the tax period the statutory monthly margins for Mills 1-2 as set forth in Finding 16 were adequate to yield petitioner its established manufacturing profit of $.05558306 per lint pound processed, and in one month no processing was done. In the remaining 15 months the extent of the inadequacy of such margins to yield such a profit was as follows [2]: October, 1933
$ 812.67
November
1,197.49
December
2,111.55
March, 1934
4,485.87
April
6,890.65
May
18,406.37
June
12,010.37
July
15,295.77
August
11,624.90
October
11,164.41
November
18,764.76
December
16,545.82
January, 1935
18,240.31
February
17,140.28
March
18,232.66
Total
$172,923.88
*141 30. The total manufacturing and selling expenses per unit for July 1933 were less than the corresponding expenses for any month of the tax period. The per pound margin [3] of Mills 1-2 for the month of July 1933 was $.2313955. The amount of the excess of that margin over a like margin for each month of the tax period, multiplied by the number of pounds processed in such month, is as follows [4]: August, 1933
$ 15,513.59
September
11,731.90
October
17,679.37
November
17,621.90
December
12,726.21
January, 1934
13,978.94
February
5,903.76
March
19,556.50
April
17,411.86
May
21,498.58
June
13,209.00
July
15,295.77
August
15,946.73
September
October
19,940.42
November
19,276.78
December
16,545.82
January, 1935
19,371.32
February
17,140.28
March
18,232.66
Total
$308,581.39
31. The per pound margin [5] of Mills 1-2 for the month of February 1936 was $.1575218. The mean of that *142 margin and the margin [6] of $.2313955 for July 1933, is $.1944586. The amount of the excess, if any, of $.1944586 over the margin for each month of the tax period, multiplied by the number of pounds processed in such month, is as follows [6]: October, 1933
$ 1,890.43
November
1,154.84
December
783.37
March, 1934
6,022.56
April
7,959.29
May
21,321.68
June
11,566.34
July
15,295.77
August
9,996.48
September
October
11,846.46
November
19,276.78
December
15,063.47
January, 1935
15,508.41
February
17,140.28
March
18,232.66
Total
$173,028.82
32. Petitioner's labor and other manufacturing expenses were increased in the tax period as compared with the base period. In respect of Mills 1-2 the average total cost per pound of lint cotton processed, for labor, direct expenses, and selling expenses only, for each month of the tax period, and for the tax and base periods, is set forth in the following table: August, 1933
$.1158039
September
.1230904
October
.1225264
November
.1252326
December
.1255918
January, 1934
.1210165
February
.1244361
March
.1207941
April
.1206236
May
.1185061
June
.1185854
July
.1220702
August
.1239451
September
October
.1259735
November
.1224529
December
.1331216
January, 1936
.1290233
February
.1243697
March
$.1267790
Tax period
$.1239406
Base period
$.0930084
Excess of average cost per
pound in tax period over
such cost for base period
$.0309322
*143 33. The statutory average unit margin of Mills 1-2 for the base period as a whole exceeded the corresponding monthly margin for each of five months of the tax period after adjusting the margin for each such month to reflect increased manufacturing and selling expenses in such month. The amount of such excess margin, multiplied in each instance by the number of pounds processed in such month, is as follows: July, 1934
$ 571.73
November
1,294.25
December
3,292.22
February, 1935
3,338.23
March
7,304.66
Total
$15,801.09
34. The nationwide unsold stocks of wide print cloths and carded broadcloths during the tax period, were as follows: Unsold stock of
Unsold stock of
printed cloths at
carded broadcloth
end of month
at end of month
Sum of
Month
(in yards)
(in yards)
(2) and (3)
July, 1933
15,732,000
6,895,000
22,627,000
August
26,039,000
13,619,000
39,658,000
September
17,317,000
5,469,000
22,786,000
October
23,422,000
6,116,000
29,538,000
November
26,251,000
6,161,000
32,412,000
December
24,333,000
5,263,000
29,596,000
January, 1934
22,341,000
4,839,000
27,180,000
February
19,633,000
3,870,000
23,503,000
March
29,952,000
7,333,000
37,285,000
April
44,949,000
10,585,000
55,534,000
May
54,455,000
17,263,000
71,718,000
June
58,376,000
23,650,000
82,026,000
July
60,642,000
28,661,000
89,303,000
August
44,802,000
29,096,000
73,898,000
September
42,241,000
30,031,000
72,272,000
October
52,547,000
28,111,000
80,658,000
November
58,818,000
31,970,000
90,788,000
December
41,665,000
24,808,000
66,473,000
January, 1935
55,709,000
27,617,000
83,326,000
February
76,118,000
29,167,000
105,285,000
March
92,638,000
28,812,000
121,450,000
*144 35. Mill 3 was originally intended and equipped for the production of one type of fabric, namely, a cotton and silk mixture which was then a standard construction, widely used for linings, dress materials, etc. Because the mill was at a competitive disadvantage in being required to purchase the yarn used in the mill a cotton spinning plant was constructed in 1929 and began operations early in 1930. In the meantime, the cotton and silk mixture cloth had practically become obsolete and the mill was left with a silk-throwing plant and machinery which were of little use for any other purpose than to produce the cotton and silk mixture. Since its cotton spinning plant was too small to provide enough yarn to run all its looms on cotton fabrics and since substantial expenditures would be required to convert production to other profitable manufacture, the mill, through 1930, 1931 and 1932, was in a state of considerable uncertainty. In the spring of 1933 certain looms in the mill were adapted to the production of all-rayon fabrics. These changes helped but did not cure the mill's difficulties and it was not until several years later, after the close of the tax period, that the mill was on *145 a profitable basis of operation. During the uncertain years, 1930 to 1933, it had not only been necessary to change its organization from a manufacturing standpoint but to build up a completely new line of customers. 36. Mill 3 was operated at a loss for all six years, 1930-1935 inclusive, with the exception of 1933. During 1934 and 1935 its operations were so costly that the board of directors considered the advisability of an expenditure of $500,000 or more to change the entire character of its production. Notwithstanding the effort to offset the losses resulting from manufacturing of cotton content fabrics by entering the all-rayon fabric field, petitioner was unable to show a net profit for the 20-month tax period. The monthly net profit or loss obtained by deducting from the statutory margins all costs and expenses relating to production and sale of all goods made in Mill 3 was as follows (figures in parentheses indicating losses): Cotton
Non-cotton
content fabrics
content fabrics
All fabrics
August, 1933
$15,417.58 $15,498.82 $30,916.40 September
11,608.48 12,836.07 24,444.55 October
10,801.57 11,792.69 22,594.26 November
7,390.20 11,379.45 18,769.65 December
( 7,545.69)
( 1,737.05)
( 9,282.74)
Total
$37,672.14 $49,769.98 $87,442.12 January, 1934
($16,780.33)
$ 6,063.48 ($10,716.85)
February
3,231.19 5,212.59 8,443.78 March
( 6,409.31)
5,445.15 ( 964.16)
April
1,896.37 4,011.32 5,907.69 May
2,561.29 4,659.43 7,220.72 June
( 7,564.91)
( 4,925.31)
( 12,490.22)
July
( 11,733.32)
( 1,508.11)
( 13,241.43)
August
( 7,421.01)
( 429.23)
( 7,850.24)
September
( 10,627.62)
( 10,627.62)
October
( 1,129.45)
( 661.88)
( 1,791.33)
November
( 14,732.31)
( 605.02)
( 15,337.33)
December
( 9,235.66)
( 2,018.18)
( 11,253.84)
Total
($77,945.07)
$15,244.24 ($62,700.83)
January, 1935
($15,989.07)
($ 1,613.32)
($17,602.39)
February
( 6,901.33)
2,175.41 ( 4,725.92)
March
( 26,545.66)
2,172.81 ( 24,372.85)
Total
($49,436.06)
$ 2,734.90 ($46,701.16)
Tax Period
($89,708.99)
$67,749.12 ($21,959.87)
*146 37. For the purpose of providing a method for making a reasonable estimate of the probable cost of production of a particular style of cloth, petitioner maintained a cost accounting system for Mill 3. Petitioner's sales price was not actually fixed by such estimate of cost; it was used merely as a guide so that petitioner's executives might intelligently determine a price to quote or accept. Prior to the manufacture of a new style of cloth, a "fabric cost card" was prepared, on which was calculated the established quantities and costs of the raw materials, as well as the probable labor and other costs entering into the production and sale of a yard of such cloth. Based upon past experience in manufacturing other fabrics, estimates were made on such cards for the stretch or contraction of the yarn to be used, for the weaving efficiency of the loom operator, and for other necessary cost computation factors. Since such cost cards were designed primarily to enable the mill executives to quote prices in advance of manufacture, certain factors of safety were used. Weaving efficiency was usually underestimated. In respect of rayon yarns, conservative estimates, if any, as to the factors *147 of stretch and contraction were used. Such cards were not used for accounting purposes and there was no necessity for exact accuracy in setting up the figures thereon. On the contrary, in order to make certain that the cards would contain factors of safety, manufacturing expense and quantities and cost of materials were not accurately set forth and were ordinarily overstated. 38. During the statutory periods petitioner manufactured approximately 50 styles of all-rayon fabrics as to which fabric cost cards were prepared and maintained. Most of its all-rayon production was confined to 10 styles. 39. The cost of doing business (exclusive of commodity costs) per unit of the commodity processed for the tax period in respect of all three mills was $.185037. The cost of doing business (exclusive of commodity cost and of the processing tax paid) per unit of the commodity processed for the base period was $.167872. Such cost of doing business per unit of the commodity processed in respect of all three mills was greater by $.0171654 for the tax period than it was for the base period. The average margin for all mills after adjustment for expenses was $.0083132 greater in the tax period than *148 it was for the base period. 40. In respect of Mill 3 cotton content fabrics, the average cost per pound of lint cotton processed, for the items of labor, direct expense, purchased yarns (cotton, rayon and silk), dyeing expense, and selling expense, for each month of the tax period, and for the tax and base periods, is as follows: August, 1933
$.29937049
September
.36284725
October
.39802982
November
.40214915
December
.55614295
January, 1934
.43769882
February
.39206769
March
.41547813
April
.38538291
May
.40279973
June
.42144363
July
.39424987
August
.37106978
September
October
.35661591
November
.48343992
December
.43068828
January, 1935
.50463302
February
.48487343
March
.69923609
Tax Period
$.42831929
Base Period
$.45885446
Excess of average cost per
pound in base period over
such cost in tax period
$.03053517
41. The statutory average unit margin for Mill 3 for the base period as a whole exceeded the corresponding monthly margin for each of 13 months of the tax period after adjusting the margin for each such month to reflect decreased manufacturing and selling expenses in such month. The amount of such excess margin, multiplied in each instance *149 by the number of pounds processed in such month, is as follows: December, 1933
$ 3.798.06
January, 1934
3,860.68
March
4,009.49
April
951.61
June
3,989.83
July
4,448.26
August
4,548.01
October
486.41
November
5,047.77
December
4,324.24
January, 1935
5,123.75
February
4,902.91
March
4,650.53
Total
$50,141.55
42. In seven of the 20 months of the tax period the statutory monthly margins for Mill 3, as set forth in Finding 16, were adequate to reimburse petitioner for all its necessary expenses of production and sale of cotton content articles and for the processing taxes paid, and in addition to provide some manufacturing profit. The profits for these seven months, after deduction of such taxes, and the amounts of taxes paid were as follows: Taxes Paid
Profit
August, 1933
$ 4,483.75
$15,417.58
September
4,357.46
11,608.48
October
4,578.88
10,801.57
November
4,817.77
7,390.20
February, 1934
4,027.21
3,231.19
April
4,569.30
1,896.37
May
5,133.37
2,651.29
Totals
$31,967.74
$52,996.68 In September 1934 no processing was done and a loss of $10,627.62 was sustained. In October 1934, the statutory margin was sufficient to reimburse petitioner *150 for all its necessary costs of production and sale, but inadequate to the extent of $1,129.45 to recoup it for both such costs and the $5,354.04 processing taxes paid for that month. In each of the remaining 11 months of the tax period the statutory monthly margin was insufficient to reimburse petitioner for its necessary costs of production and sale by an amount exceeding the amount of processing taxes paid for the month. The losses for these 11 months, after deduction of such taxes, and the amounts of taxes paid were as follows: Taxes Paid
Loss
December, 1933
$ 3,798.06
$ 7,545.69
January, 1934
3,860.68
16,780.33
March
4,607.02
6,409.31
June
3,989.83
7,564.91
July
4,448.26
11,733.32
August
4,548.01
7,421.01
November
5,047.77
14,732.31
December
4,324.23
9,235.66
January, 1935
5,123.75
15,989.07
February
4,902.92
6,901.33
March
4,650.54
26,545.66
Totals
$49,301.07
$130,858.60
43. Petitioner, during the statutory period, operated at a net loss as to all of its mills combined, totaling $93,183; during the tax period it realized a net operating profit of $274,637.89. 44. Petitioner did not bear the burden of any part of the amount it paid as tax *151 with respect to its processing of cotton. Opinion VAN FOSSAN, Judge: The question for decision in this case is whether respondent erred in disallowing petitioner's claim for refund of processing taxes or, stated otherwise, did petitioner bear the burden of any part of the processing taxes paid by it. The burden of proof rests on petitioner. Petitioner's consul frankly admitted that petitioner, like the rest of the industry, tried to pass the tax on, "did our best to pass it on", but he contends, "didn't succeed but to a minor degree". The parties have stipulated the statutory margins for the base period and the tax period and petitioner admits that the margins so computed create a presumption against it. Petitioner, however, places great stress on the fact that due to the circumstance that the accounts of Mill 3 were kept entirely separate from Mills 1-2, the statutory margins could be determined only by computing margins separately for the two units and then combining the two results. Petitioner then points to the fact that while the statutory margin so complied is adverse to it, and although the separate margin of Mills 1-2 is also adverse, the separate margin of Mill 3 is favorable *152 to it. Pursuing this thought further, petitioner contends that it "literally conducted two entirely separate businesses" and on this premise erects various computations of tax alleged to have been borne by the mills separately. Petitioner's chief reliance is placed on its argument that the law of supply and demand controls a case such as the present and that competition in the market made it impossible for petitioner to pass on the tax. Voluminous testimony was adduced in an attempt to substantiate this concept. Petitioner also contends that the tax burden borne can ordinarily best be measured by comparison of prices before and after imposition of the tax. While conceding that the computation of margins under section 907 accords with commercial practice, petitioner argues that the specific method there contemplated of "average margins" has very limited probative value or legal effect. It is also contended that the statutory base period is not representative. Finally, petitioner argues that it is entitled to a fair return on its capital investment. We are unable to agree with petitioner's treatment of the mills as separate businesses and cannot approve the consequences claimed to *153 result from such treatment. We have found that despite the maintenance of separate books of account, the manufacture of different products, the employment of different sales agencies, and the maintenance of separate organizations for Mills 1-2 and Mill 3. the business of petitioner was carried on and maintained as a single business venture. On the facts before us we are of the opinion that petitioner's business must be treated as a single business entity in the solution of the problem presented. We have observed that the petitioner has the burden of proof. To carry this burden successfully requires that on study of all the evidence there shall be created in the minds of the triers of the facts a conviction that respondent erred. We deem it unnecessary to discuss petitioner's contentions seriatim or to attempt to assay and determine the precise weight to be given to each of the several factors advanced in support of its position. Suffice it to say that the aggregate of their weight is insufficient to bring conviction in our minds that petitioner bore the burden of any part of the processing tax paid by it. Decision will be entered for the respondent. Footnotes
1. Differences in styles are due, not merely to differences in weave, cotton, or arrangement of colored threads but also in many instances to differences in content, rayon and silk being used as well as dyed and undyed combed cotton yarn.↩
2. In July and December 1934, and February and March 1935, the inadequacy exceeded $0.042 per pound, and for those months there is entered in the above tabulation only the product of $.042 by the number of pounds processed.↩
3. Computed in the same manner as the monthly margins set out in Finding 16. ↩
4. In March 1934 and all succeeding months such excess margin was greater than $.042 and for the same reason set forth in the preceding paragraph there is entered only the product obtained by using $.042.↩
5. See footnote 3. ↩
6. In July and November 1934, and February and March 1935, such excess margin was greater than $.042, and there is entered only the product obtained by using $.042.↩